Filed 10/15/13  In re Daniel O. CA2/4

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re DANIEL O., III, et al.,<br><br>Persons Coming Under the Juvenile Court Law. | B243435<br>(Los Angeles County<br> Super. Ct. No. CK67881) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>DANIEL O.,<br><br>　　　Defendant and Appellant. | |

　　　APPEAL from an order of the Superior Court of Los Angeles County, Jacqueline H. Lewis, Juvenile Court Referee.  Affirmed.

　　　Daniel G. Rooney, under appointment by the Court of Appeal, for Defendant and Appellant.

　　　John F. Krattli, County Counsel, James M. Owens, Assistant County Counsel, and Kimberly A. Roura, Associate County Counsel, for Plaintiff and Respondent.

# INTRODUCTION

Father, Daniel O. (Daniel), appeals from a dependency court order sustaining dependency jurisdiction over his three minor children: (1) Heaven O., age 14, whose mother is Wendy Y.; (2) Mariah, age four, whose mother is Ashley G.; and (3) Daniel O., III (Danny), six months of age, whose mother is Tina L. Jurisdiction was sought over these children largely based on allegations that Daniel physically and sexually assaulted Aileen C., the four-year-old daughter of one of his female companions, Virginia M. Daniel asserts that the dependency court erred in admitting the out-of-court statements of Aileen C. regarding the abuse, when Aileen was found not competent to testify at trial and thus could not be cross-examined. He further asserts that substantial evidence did not support the findings that he assaulted Aileen, or that his three children were at serious risk of physical or sexual abuse. We affirm the order sustaining jurisdiction.

# FACTUAL AND PROCEDURAL BACKGROUND

## I. *Initial Police Report and Hospital Records Regarding Aileen*

On Sunday, October 9, 2011, Aileen was taken to the hospital, where staff called law enforcement. At the hospital, Deputy Sheriff Guadalupe Lopez interviewed Aileen's paternal grandmother (Grandmother), her father Mario C., and Aileen herself. According to the police report, Grandmother stated that Aileen began to complain of pain in her lower abdominal and vaginal areas as soon as Grandmother picked her up on the afternoon of Friday, October 7, 2011. When Grandmother questioned Aileen about what had happened, Aileen responded by holding her vaginal area with both hands and saying "tu-tu." When Grandmother took Aileen to the bathroom later, she saw a clear discharge with blood in her

2

underpants.  When Aileen was done urinating, Grandmother wiped her and more clear discharge with blood appeared on the toilet paper.

Grandmother said she waited until Sunday to tell Mario because she thought maybe Aileen had just bumped herself and the pain was going to go away, but Aileen continued to complain of abdominal and vaginal pain.  Grandmother and Mario drove her to the hospital on Sunday evening.

Deputy Lopez sat next to Aileen's hospital bed and spoke with her.  Aileen was excited to have her there, asked her questions about her equipment, and played with her flashlight.  When asked why she was in the hospital, Aileen said she was not sure.  Deputy Lopez asked her if she felt pain anywhere, and Aileen said, "Daniel punched me," and made a fist with her left hand and motioned toward her stomach.  Deputy Lopez asked who Daniel was, and Aileen looked down and did not want to talk about Daniel.  Deputy Lopez asked if she could draw a picture of Aileen so Aileen could show her where she was hurt.  Aileen answered, "I was holding hands with my friend and he touched us both and grabbed us right here," as she motioned to her vaginal area.  Deputy Lopez drew a sketch of a figurine, and Aileen took her pencil and drew what she described as a "sad face, 'cause I'm hurt of Daniel."  She also scribbled in the hand areas and said, "Daniel hit me here when I'm with Mom."  When asked what else Daniel did, Aileen began to scribble in the breast area and stopped and motioned with both hands in her breast area. She said, "Daniel rubbed me and my friend here and grabbed me hard here," as she motioned towards her vagina and closed her right hand to make a grabbing motion. Deputy Lopez asked who her friend was and Aileen said, "A girl who lives there with my mom, I don't know."  She refused to write on the sketch and placed the pencil back on Deputy Lopez's uniform shirt.  Deputy Lopez attempted to ask her

3

more questions, but Aileen stayed quiet, looked down, and played nervously with her hands.

Grandmother said Mario and Aileen's mother, Virginia, had been separated for two years, and per their agreement to share custody, Grandmother picked up or dropped off Aileen and her siblings Jeremiah and Nalani every other Friday. She believed Virginia had a live-in boyfriend named Daniel. Aileen and her siblings had previously told her that Daniel punched them in the stomach, and after one stay at Virginia's home they had returned home with bruises.

Mario said that Grandmother had informed him that she found blood spots and discharge on Aileen, and he reported that Aileen had complained of pain in her abdominal area for two days. He indicated that during the custody proceedings regarding Aileen and her siblings, the children alleged that Daniel hit them and caused bruising. The judge in their case was notified of the incidents but a criminal report was not generated. In order to avoid problems, Mario only communicated with Virginia through Grandmother, and Grandmother picked up and dropped off the children. He had not seen or communicated with Daniel and did not know who Daniel was.

Deputy Lopez spoke to the attending physician, who did not find anything abnormal but stated he was not a specialist and could not determine if foul play had occurred. A sexual assault kit was performed on Aileen the next day, but the nurse who administered it could not confirm or negate sexual abuse and did not question Aileen. Deputy Lopez recovered from Mario's house the clothing Aileen wore on the day bloody discharge was found in her underwear. The underwear reportedly had been washed and worn once since the incident.

The emergency physician record lists the chief complaint as an "alleged sexual assault possibly at mom's house." It records an observation by

4

Grandmother that Aileen's vaginal opening looked "wider than usual," that Aileen was afraid to be touched there, and that there were "a lot of men" going to Aileen's mother's place. No bleeding, discharge, swelling or tenderness of the genitalia were found.

The report from the rape kit examination states that the examination neither confirmed nor negated sexual abuse. The aftercare instructions for Aileen included recommendations for treating "child vulvitis."

## II. *Pre-Adjudication Investigation by DCFS*

### A. *Witness Interviews Regarding Allegations of Abuse of Aileen*

#### 1. *Aileen's Statements*

During a caseworker's private interview with Aileen, the girl appeared very shy, quiet, and apprehensive. The caseworker asked if Aileen knew what her private parts are, and she nodded her head, "yes." When asked to point to her private parts, Aileen shook her head, "no." When asked two times if anyone had ever touched her private parts, Aileen stayed quiet and played with her puppy. When the caseworker asked if it was okay that she was asking these questions, Aileen shook her head "no." When the caseworker told her she did not have to talk to her if she did not want to, Aileen grabbed her puppy and ran inside the house.

Subsequently, a deputy from the Special Victim's Bureau questioned Aileen about whether anyone had touched her vagina, using a drawing of a girl's body, and Aileen said no. When asked if anyone had ever hit her, she again said no.

When another dependency investigator later interviewed Aileen, she was friendly, cooperative, and outgoing until questioned about Daniel, at which point her demeanor changed, and she became tense and quiet and would not make eye contact. She gave only limited responses to questions regarding the alleged abuse.

When asked if Daniel had been physically abusive towards her, Aileen responded, "I don't want to talk about him." When asked why, she said, "He's mean." She went on to state, "He threw me on the bed and it hurt." In response to multiple further questions about possible physical abuse by Daniel, Aileen kept repeating, "He's mean." With respect to alleged sexual abuse, when shown a diagram of a female girl and asked if she knew where the private parts were, Aileen nodded "yes," and stated, "I don't want to talk, can I go home?" The caseworker asked if Daniel ever touched her in her private parts, and Aileen responded by stating, "I want to sleep in my room," and when asked to explain, she stated, "Mom says I have to sleep in there (referring to mother's bedroom), but I want to sleep in my room." When asked who else sleeps in the mother's room, Aileen said, "I don't want to talk, I am scared." The caseworker terminated the interview because it appeared Aileen was experiencing a great deal of distress.

### 2. *Daniel's Statements*

Daniel denied the allegations and said he was never alone with Aileen. He stated that he lived with his mother as well as Tina, the mother of his youngest child, Danny. He sometimes brought his daughter Mariah to Virginia's home on weekends so she and Aileen could play together, but he denied ever touching either child, or any child, inappropriately. He said he was rarely alone with Mariah either.

Daniel agreed to take a polygraph examination, which was conducted on October 25, 2011. Daniel passed all the questions except five or six regarding whether he touched Aileen's vagina. He later stated that he did not believe the results, and that when the examiner was asking questions about the sexual abuse he

6

kept hitting the button. The dependency court ultimately excluded the evidence of the polygraph results.

Daniel claimed that Grandmother was "putting stuff in [Aileen's] head." He reported that Aileen's paternal grandfather had confronted him at Aileen's preschool one day, cursing at him and saying he had hit the kids. Daniel claimed that when Aileen and her siblings go to Mario's house, they come back dressed in old clothes and once Jeremiah came back with a bruise.

### 3. *Virginia's Statements*

In an interview with a caseworker, Virginia appeared shocked by the allegations of Daniel's sexual abuse of Aileen and denied that they were true. She stated that she was always with her children and did not leave Daniel alone with them, and if she had to go out, the maternal grandmother watched them. She stated that she was very aware of who her children were around because she was molested as a child by a family friend and she never wanted that to happen to her daughters. She denied that Daniel lived with her but stated he slept over sometimes. When the caseworker informed her that it was also alleged that Daniel had touched another little girl who was with her daughter, Virginia stated that Daniel had a daughter named Mariah, who is also four years old, who comes over to play with Aileen when Daniel has her on the weekends.

Virginia stated that when the children are going to Mario's home, the two girls cry and say they do not want to go. The week before, Aileen had stated, "I'm a bad girl." When Virginia asked her what had happened, Aileen would not tell her.

In a later interview, Virginia told a dependency investigator that she had never seen anything to lead her to suspect Daniel. Aileen had never mentioned any

abuse or complained of pain. According to Virginia, Aileen was an active, happy girl, who liked to play with Daniel and was always excited to see him. She insisted that Daniel was never alone with the children. When told that Daniel had failed a polygraph test about the molestation, Virginia stated that this was "concerning" and that she wanted to find out what had really happened.

### 4. *Statements by Aileen's Siblings*

Aileen's five-year-old brother Jeremiah denied ever being touched in his private parts. When asked if he liked Daniel, Jeremiah said, "sometimes yes, sometimes no." He said sometimes Daniel and Virginia fought, but he denied that they pushed or hit each other. He said he felt safe with Virginia and Daniel, and with Mario.

In a subsequent interview, a dependency investigator asked Jeremiah if Daniel had been physically abusive towards him or any of the other children. Jeremiah stated, "I want to live with my mom but no Daniel scares me." When asked why Daniel scares him, Jeremiah stated, "He makes my mom cry . . . in the car he went like this," and Jeremiah demonstrated a slapping or pushing movement. When asked if Daniel hits him, his siblings, or his mother, Jeremiah responded by stating, "He makes my mom cry." Daniel again said he had never been touched in his private parts and had not seen his sisters being touched there.

Aileen's two-year-old sibling Nalani was not able to provide a meaningful statement.

### 5. *Statements by Aileen's Paternal Relatives*

Mario stated that Aileen had never said anything about Daniel prior to this incident, but that she appeared to be afraid every time his name was mentioned.

He also said that lately she had been really quiet and only wanted to play by herself, which was unlike her. He had not noticed any sexualized behavior.

In a later interview with a dependency investigator, Mario said he believed his daughter "100 percent" and asserted that she would not make this up. He stated that it was the police officer at the hospital who told him what Aileen had said, and Aileen had never said anything to him before. He said that Aileen had told him several months before that Daniel hit Jeremiah, but that his children did not talk about Daniel much, except Jeremiah would sometimes talk excitedly about Daniel's car and about how he drives really fast. Mario also said that when he asks Aileen about Daniel she gets really nervous, so he does not bring it up. He noticed that around the time of the hospital visit Aileen had been playing by herself and not really wanting to play or talk with anyone else, but that was better now. He also noticed that she "plays with herself" a lot while watching television.

Grandmother told a caseworker that on the Friday evening after she picked up Aileen, she was putting a diaper on Aileen, who sometimes still wet the bed. Aileen pointed to her private parts and said they hurt.[1] Grandmother asked her why they hurt, and Aileen said, "Daniel Ochoa touch me." Grandmother said she told Aileen, "No, Daniel Ochoa did not touch you." Aileen stated "Yes he did." Grandmother did not ask Aileen how or when Daniel touched her. Grandmother stated that she called one of her sons and told him, but she did not tell Mario because she was afraid he would overreact and do something stupid. She wanted her other son to talk to Mario. When asked why she waited until Sunday to take Aileen to the hospital, she said she was at the hospital all day Saturday with her

---

**1**     Aileen's daycare provider reported that Aileen had not complained of falling or injuring herself at daycare, and had not been crying as if she had injured herself.

sick and blind husband. When asked if Aileen had ever mentioned Daniel before, Grandmother stated that the children would tell her and Aileen's father that Daniel hit them.

The caseworker asked Grandmother if she had noticed Aileen exhibiting any sexualized behavior, and Grandmother said that about five months earlier, she noticed that Aileen was taking a long time in the bathroom, and Grandmother caught her touching herself in the bathroom. When Grandmother asked her why she was touching herself, Aileen looked at her and cried. Grandmother had also observed Aileen looking at herself in the mirror and touching her breast. On another occasion, when Mario's adult friend came over for the first time, Aileen tried to rub herself on him and sit on his lap, to the point that the friend became uncomfortable and left.

Grandmother told a dependency investigator that she had not asked Aileen about the abuse because she did not want to upset her more. The only thing Aileen had said was that she did not want to see her mother or Daniel and that she was scared. Aileen had been waking up in the night complaining of nightmares and Grandmother would find her curled up in a ball in the corner of the bed. She would not talk to Grandmother and only wanted to talk to Mario. She had also been wetting the bed lately.

### 6. *Maternal Relatives' Statements*

Aileen's maternal grandmother stated she had no concerns of abuse by Daniel, and said she and Virginia were always home with the children. She claimed that Mario's family was upset that Virginia had a boyfriend. Virginia's father, who lives in the back duplex of Virginia's home, stated he had never seen Daniel hit Aileen or touch any of the children inappropriately. Aileen's maternal

aunt, who also lives in Virginia's home, stated that Daniel seemed like a "good guy" and that he got along well with the kids.

B.      *Investigation Regarding Possible Abuse of Mariah*

A caseworker interviewed Mariah and her mother Ashley on October 12, 2011. Ashley was very concerned about the allegations regarding Aileen and Mariah. She stated that she had full custody and Daniel had been out of Mariah's life prior to April 2011 because he had been in jail. After he got out of jail, however, Daniel was successful in procuring unmonitored visitation with Mariah every other weekend, beginning in April 2011, although sometimes Mariah would refuse to go with Daniel.

The caseworker assessed that Mariah was not able to tell the difference between truth and lies and could not identify her body parts. The caseworker pointed to her chest and vaginal area and asked if anyone had touched Mariah there, and Mariah shook her head. The caseworker asked if Mariah's mother had ever helped her use the bathroom and touched her there, and Mariah said, "no." The caseworker determined that Mariah was too young to make a meaningful statement.

Mariah had a medical examination on October 13, 2011, which neither confirmed nor negated the possibility of sexual abuse. Mariah told the medical examiner that she liked living with Ashley, but did not like staying with Daniel, although she would not explain why. Ashley reported that Mariah told her that when she stayed at the home of Daniel's girlfriend Tina, she slept in a bed with Daniel, Tina, and Danny. She reported that she slept with Daniel when she stayed at Virginia's house.

11

Subsequently, Ashley reported that Mariah had begun having toilet accidents since the allegations surfaced. Ashley had asked her if anyone touched her private parts, but Mariah would become embarrassed and not respond.

Ashley had a restraining order in place against Daniel for domestic violence against her and her son, Ruben, who was Mariah's half-brother. When Ruben was four, and Daniel and Ashley had separated, Daniel came to the house and he and Ashley got into an argument. Ruben became scared that Daniel was going to hurt Ashley and he threw his yogurt at Daniel. Daniel then kicked Ruben in the stomach, leaving Ruben gasping for breath and unable to breathe.

### C. *Daniel's History*

Daniel disclosed that he had been molested by a neighbor growing up, and there were seven DCFS referrals alleging sexual abuse, all of which were found to be inconclusive.

In addition, Daniel had a criminal history involving sexual and physical abuse of women and teenage girls. He acknowledged that was accused of inappropriate touching when he was 12 or 13 years old and stated he was arrested at age 14 for domestic violence and committed to the California Youth Authority until age 18. In addition to numerous drug and firearm offenses, his adult criminal history includes (1) when he was 25 years old, an offense involving a 16-year-old girl for which he initially was charged with forcible rape, but was convicted of the lesser offense of sex with a minor; (2) a separate conviction for sex with another minor girl no more than 15 years old, when Daniel was over 21; (3) assault of a spouse with bleach, and (4) multiple convictions for domestic violence involving different women. In interviews with caseworkers, he claimed that the police as well as the women lied in all these cases.

A 2004 police report regarding one of the statutory rape offenses discloses that the 16-year-old victim contacted the Sheriff's Department to report a rape. The victim stated she had been in a dating relationship with Daniel for approximately one month. They previously had consensual sex, but on the occasion in question, Daniel started to get rough with her while they were kissing and pinned her wrists against the bed. She told him to stop and tried to punch him and kick him off her, and Daniel punched her on the head, arms and thighs, overpowered her, and pulled her jeans off and forcibly raped her, ignoring her pleas that he stop. Afterwards he threatened to send someone to kill her if she told the police, and she believed he could carry this threat out because he was a gang member. The police officer observed large bruises on her arms, wrists, and thighs. A rape kit examination was performed and evidence of sexual assault was found. During the subsequent investigation, the victim reported that Daniel had begun beating her up for no apparent reason soon after they began dating, but she did not report the abuse because she was afraid of him. Daniel admitted that he knew the victim was under age, but claimed the sex was consensual and denied hitting her.

III. *Jurisdiction Hearing and Findings*

A. *Dependency Jurisdiction Allegations*

Dependency petitions filed with respect to Heaven, Mariah, and Danny alleged that jurisdiction was appropriate under Welfare and Institutions Code section 300, subdivision (a)[2] based on the fact that Daniel had punched Aileen in the abdomen with his fists. Jurisdiction was alleged under section 300, subdivision

___

[2] All subsequent undesignated code references are to the Welfare and Institutions Code.

(b) based on Daniel's sexual and physical abuse of Aileen. Jurisdiction under section 300, subdivision (d) was alleged based on Daniel's sexual abuse of Aileen.

In addition, as to Heaven, jurisdiction was sought under section 300, subdivisions (b) and (d), based on Daniel's criminal history of sex with minors. Further, jurisdiction was sought under subdivisions (a) and (b), based on the allegation that Heaven's mother, Wendy Y., inappropriately disciplined Heaven by striking her with a belt. Further, jurisdiction under subdivision (b) was asserted based on the fact that Heaven suffers from mental and emotional problems, including depression and deficit hyperactive disorder, that Heaven's mother failed to regularly provide her with psychotropic medication, and that Heaven had exhibited aggressive and assaultive behavior towards a law enforcement officer.

As to Mariah, jurisdiction was additionally sought under section 300, subdivisions (b) and (d), based on Daniel's criminal history, including a conviction for sex with a minor, and under subdivisions (a) and (b) based on Daniel's physical abuse of Mariah's half-brother Ruben by kicking him in the stomach. Further, jurisdiction was alleged under subdivision (b) because Daniel allowed his female companion Tina, whom he knew to be a current user of methamphetamine, to have unlimited access to the Mariah. Allegations under subdivision (j) were also included based on Daniel's sexual and physical abuse of Aileen and his physical abuse of Mariah's sibling.

As to Danny, jurisdiction was additionally alleged under section 300, subdivision (b) based on Tina's history of drug abuse and current use of methamphetamine and amphetamine, and because she previously had two other children permanently removed from her as a result of her substance abuse.

B. *Jurisdiction Hearing*

Beginning on April 4, 2012, the court held a joint hearing to adjudicate the four cases as to Danny, Mariah, Heaven, and Aileen and her siblings. DCFS reports memorializing the DCFS investigation and incorporating the police reports were admitted into evidence. Although no objection was made at trial at the time these exhibits were introduced, Daniel had previously filed objections to the admission of hearsay in the DCFS reports.

1. *Testimony of Aileen*

The court questioned Aileen in chambers to determine whether she was competent to testify at the hearing. After asking her a number of questions, the court determined she was not competent to testify because she was not able to understand the consequences of telling lies versus the truth. The jurisdiction hearing was continued so that Daniel could file a motion to strike Aileen's out-of-court statements as hearsay.

Daniel filed a motion to exclude Aileen's out-of-court statements to Grandmother on October 7, 2011, and to Deputy Lopez on October 9, 2011. The court denied the motion, finding that Aileen's statements were admissible under *In re Cindy L.* (1997) 17 Cal.4th 15 (*Cindy L.*) and *In re Lucero L.* (2000) 22 Cal.4th 1227 (*Lucero L.*) Although Aileen was not competent to testify as she was unable to understand the duty to tell the truth, the court found that the time, content, and circumstances of her out-of-court statements bore sufficient indicia of reliability because (1) Aileen made the majority of the statements contemporaneously with reporting the physical sensation of pain in her abdomen and vagina; (2) the statements were made close in time to the alleged incident; (3) the statements were spontaneous and did not appear to be the result of suggestive or leading

questioning; (4) the statements were consistent over time; (5) there was no indication of a motive to lie on the part of Aileen or her relatives; (6) Aileen's statements were consistent with the court's observations of the child; and (7) Aileen used terminology expected of a child of her age talking about subjects that were not within the knowledge of a child of that age. The court further found that independent evidence corroborated the statements, including the bloody discharge from Aileen's vagina.

### 2. *Testimony of Deputy Lopez*

Deputy Lopez testified that she and her partner, Deputy Ed Hernandez, had responded to Monterey Park hospital on Sunday, October 9, 2011, and spoke to Grandmother first, while Aileen's father was with the child in her hospital room. Grandmother told her that for two days, Aileen had been complaining of abdominal pain. In addition, two days earlier, when Grandmother took Aileen to the restroom and wiped her, she saw discharge and blood. Grandmother said she thought Aileen might have hit herself, but she stated that she did not know what the cause of the blood and discharge could be. Grandmother reported that she had told Mario earlier that day that she had found some discharge in Aileen's underwear, and he became concerned and decided to take Aileen to the hospital.

Deputy Lopez met with Mario next, and he told her he was concerned about the discharge and the blood and he stated Aileen had never had this issue before. He stated that Grandmother had just told him what she had discovered, and he had not seen the discharge or blood himself.

Next, Deputy Lopez spoke with Aileen in her hospital room, while Mario and Grandmother were outside the room. Aileen was excited and smiling, and wanted to play with Deputy Lopez's equipment and her radio. She freely

16

answered questions about her age and what she liked to do for fun. Deputy Lopez asked her if she knew why she was at the hospital, and she said she did not know. Deputy Lopez then drew a figurine of a person and told Aileen that it was her, and asked her to show her on the picture if she was hurt anywhere. Aileen responded by taking the pencil from Deputy Lopez's uniform pocket and scribbling on the hands, breast, and vaginal area of the figure, and as she scribbled she said that Daniel rubbed her, and she used her hands to show where she was touched. She first rubbed her chest area, and then motioned towards her vaginal area and said Daniel grabbed her there. She said that she played with another little girl and that Daniel touched both of them in the breast area, but she would not tell Deputy Lopez the name of the other child or give her any more information about the child. Aileen would look down and stop every time she mentioned Daniel. Then she "shut down" and would not answer questions about where her mother was at the time, who "Daniel" was, or when she was hurt. Deputy Lopez said Aileen appeared to be holding something inside that she would not let out.

Deputy Lopez then spoke again with Grandmother and, without explaining why she was asking, asked her who Daniel was. Grandmother told her Daniel was Virginia's live-in boyfriend. She provided a description of Daniel, but she did not ask why Deputy Lopez needed the information. She stated that she had seen Daniel when she picked up or dropped off Aileen at Virginia's home, but she had not talked to him. She had last seen him two days earlier when she picked up Aileen at Virginia's house.

Deputy Lopez then spoke with Mario again and told him what Aileen had said. He reacted angrily and started to curse. He was concerned and wanted to know what he could do to help Aileen.

17

Deputy Lopez also spoke with the treating physician, who was concerned Aileen was having discharge and bleeding from her vagina. He could not see any indication of foul play, but he recommended a sexual assault kit because he had concerns that she may have been sexually assaulted.

C. *Dependency Court Findings*

After the hearing, the court noted that it considered the case "relatively close," and that it had been concerned when Aileen did not qualify as a witness, but that Deputy Lopez's testimony giving context to Aileen's statements led the court to conclude that the allegations were true by a preponderance of the evidence. The court found compelling Aileen's statements as well as the drawing she made over the portions of her body she believed had been injured. Further, the court noted the corroborating evidence, specifically the blood and discharge in Aileen's underwear. The court noted that no evidence had been presented that Grandmother and Mario had a motive to falsely accuse Daniel or that they had coached Aileen to make the accusations. The court found it telling that neither Grandmother nor Mario had accused Daniel, and instead had seemed surprised by Aileen's spontaneous statements to Deputy Lopez.

As to Heaven, her mother pled no contest to the allegation under section 300, subdivision (a) regarding physical abuse by the mother. The court also sustained dependency jurisdiction under subdivisions (a), (b) and (d) based on Daniel's physical and sexual abuse of Aileen, noting that Daniel's criminal history was relevant as well.

As to Mariah, the court sustained jurisdiction under section 300, subdivisions (a) and (b) based on Daniel's physical abuse of Aileen and Mariah's sibling Ruben, and his criminal history, which the court found showed that Daniel

18

was likely to "cross societal bounds." In addition, the court sustained jurisdiction under subdivision (b) based on Daniel's allowing Tina, a current drug user, to have unlimited access to Mariah. The court dismissed the allegation under subdivision (j).

As to Danny, the court dismissed the allegation under section 300, subdivision (a) (based on serious physical harm inflicted on Aileen), but sustained dependency jurisdiction pursuant to subdivision (b) based on Daniel's physical and sexual abuse of Aileen as well as Tina's drug abuse. Although the court noted that it was aware of disagreements in the case law with respect to the probability of sexual abuse of a male child when his parent has sexually abused a female child, the court sustained jurisdiction under subdivision (d) based on the sexual abuse of Aileen. The court found that it was not determinative that Danny was not the same sex as Aileen, and found it more compelling that, like Aileen, Danny was very young and pre-pubescent. The court's decision predated the recent Supreme Court decision in this area, *In re I.J.* (2013) 56 Cal.4th 766, 773.

Father appealed from the jurisdictional orders. After the notices of appeal were filed, the court terminated jurisdiction as to Mariah. We granted County Counsel's motion to augment the record to include the order terminating jurisdiction and providing for supervised visitation of Mariah by Daniel. The order states that visitation must be supervised due to Daniel's "sex abuse of [a] very young child."

## DISCUSSION

Daniel alleges that the dependency court erred in sustaining allegations as to him under section 300, subdivisions (a), (b), and (d), with respect to Heaven,

19

Mariah, and Danny.  We conclude that substantial evidence supported the court's findings.

I. *Daniel's Appeal Is Not Moot*

      A. *Danny and Heaven*

As a preliminary matter, County Counsel argues that Daniel's appeal challenging the jurisdictional findings against him is moot as to Danny and Heaven, because as to Danny, dependency jurisdiction under section 300, subdivision (b) is unchallenged based on his mother's history of drug abuse, and, as to Heaven, jurisdiction is unchallenged under subdivision (a) based on her mother's physical abuse.  Given the circumstances here, we disagree that Daniel's appeal is moot.

"'When a dependency petition alleges multiple grounds for its assertion that a minor comes within the dependency court's jurisdiction, a reviewing court can affirm the juvenile court's finding of jurisdiction over the minor if any one of the statutory bases for jurisdiction that are enumerated in the petition is supported by substantial evidence.  In such a case, the reviewing court need not consider whether any or all of the other alleged statutory grounds for jurisdiction are supported by the evidence.' (*In re Alexis E.* (2009) 171 Cal.App.4th 438, 451.)" (*In re I.J., supra,* 56 Cal.4th at p. 773.)  However, we may exercise our discretion and reach the merits of a challenge to any jurisdictional finding when the finding could be prejudicial to the appellant or have other consequences for him outside the dependency proceedings.  (*In re Drake M.* (2012) 211 Cal.App.4th 754, 762-763; *In re D.C.* (2011) 195 Cal.App.4th 1010, 1015.)  "Here, the outcome of this appeal is the difference between father's being an 'offending' parent versus a 'non-offending' parent.  Such a distinction may have far-reaching implications with

20

respect to future dependency proceedings in this case and father's parental rights. Thus, although dependency jurisdiction over [Daniel] will remain in place because the findings based on mother's conduct are unchallenged, we will review father's appeal on the merits." (*In re Drake M., supra,* 211 Cal.App.4th at p. 763.)


B. *Mariah*

County Counsel also argues that because dependency jurisdiction has been terminated over Mariah, the appeal from the earlier order sustaining jurisdiction in her case is moot. We disagree.

Although, as a general rule, an order terminating juvenile court jurisdiction renders an appeal from a previous order in the dependency proceedings moot (*In re Michelle M.* (1992) 8 Cal.App.4th 326, 330), dismissal in such circumstances is not automatic, and instead "must be decided on a case-by-case basis." (*In re Kristin B.* (1986) 187 Cal.App.3d 596, 605.)

*In re Joshua C.* (1994) 24 Cal.App.4th 1544 is instructive. In that case, the juvenile court sustained dependency jurisdiction after finding that the appellant had sexually abused his daughter and that her sibling was in danger of being sexually abused. At the subsequent dispositional hearing, the court awarded sole custody of the minors to their mother, restricted the appellant's visitation, and terminated dependency jurisdiction. (*Id.* at p. 1547.) On appeal, the court rejected the respondents' contention that the appellant's appeal from the jurisdictional order was moot due to termination of the dependency proceedings. The court concluded the jurisdictional findings were reviewable because they were basis for the continuing custody and visitation orders and the appellant would be collaterally estopped from relitigating the jurisdictional issues in family court. (*Id.* at p. 1548.) "As the jurisdictional findings are the basis for the restrictive visitation and

21

custody orders, error in the former undermines the foundation for the latter.  [¶] The fact that the dependency action has been dismissed should not preclude review of a significant basis for the assertion of jurisdiction where exercise of that jurisdiction has resulted in orders which continue to adversely affect appellant.  If the jurisdictional basis for orders restricting appellant's visitation with, and custody of, [Daniel] is found by direct appeal to be faulty, the orders would be invalid." (*Id.* at p. 1548; see also *In re J.K.* (2009) 174 Cal.App.4th 1426, 1431 [holding that despite termination of the jurisdiction of the juvenile court, father could appeal the jurisdictional order resulting from findings that he abused his daughter in part because these findings had an adverse effect on his custody rights]; *In re Daisy H.* (2011) 192 Cal.App.4th 713, 716 [holding that termination of jurisdiction did not moot father's appeal where jurisdictional findings, "if erroneous, could have severe and unfair consequences to Father in future family law or dependency proceedings."].)

Similarly, in this case, the jurisdictional findings regarding Daniel's sexual abuse of Aileen were the explicit basis for the continuing visitation order restricting his visitation.  That visitation order would be directly affected were Daniel successful in having the dependency court's jurisdictional findings reversed in this appeal.  Therefore, the appeal from the jurisdictional order in Mariah's case is not moot.

II. *Sufficient Evidence Supported Jurisdictional Findings as to Daniel*

Daniel challenges the sufficiency of the evidence supporting the findings that he physically and sexually abused Aileen, which findings in turn were used as a basis for exercising jurisdiction over Heaven, Mariah, and Danny under section 300, subdivisions (a), (b), and (d).  Daniel further contends that there was no

22

substantial evidence demonstrating that Heaven, Mariah, or Danny were at serious risk of physical or sexual abuse.

In reviewing a challenge to the sufficiency of the evidence supporting jurisdictional findings, we determine if substantial evidence, contradicted or uncontradicted, supports them, drawing all reasonable inferences from the evidence to support the findings and orders of the dependency court. We do not reweigh the evidence or exercise independent judgment, and review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence such that a reasonable trier of fact could find that the order sustaining jurisdiction is appropriate. (*In re I.J., supra,* 56 Cal.4th at p. 773.)


A. *Evidence of Physical and Sexual Abuse of Aileen by Daniel*

    1. *Standard for Admissibility of Aileen's Out-Of-Court Statements Regarding Abuse*

Daniel contends that the dependency court violated his right to due process by admitting into evidence social study reports by DCFS containing Aileen's hearsay statements to her grandmother and Deputy Lopez suggesting that she had been physically and sexually abused. Daniel contends that the statements were inadmissible because they were uncorroborated. We disagree with Daniel's contention that Aileen's hearsay statements must be corroborated in order to be admissible. In any event, there was corroborating evidence of abuse.

Section 355 provides that hearsay evidence contained in a social study report may be admissible and constitute competent evidence upon which a finding of dependency jurisdiction may be based. (§ 355, subd. (b).) If, however, a party timely objects to the admission of specific hearsay evidence contained in such a study, that evidence "shall not be sufficient by itself to support a jurisdictional

23

finding or any ultimate fact upon which a jurisdictional finding is based," unless one of several exceptions applies. (§ 355, subd. (c)(1).) The relevant exception here is for hearsay by a minor under 12 years of age who is the subject of the jurisdictional hearing. (§ 355, subd. (c)(1)(B).) Hearsay by such a minor is admissible in a dependency proceeding unless the objecting party "establishes that the statement is unreliable because it was the product of fraud, deceit, or undue influence." (§ 355, subd. (c)(1)(B).)

In *Lucero L.*, our Supreme Court considered whether section 355 controls when the hearsay statement comes from a minor who is deemed incompetent to testify because he or she lacks the capacity to distinguish between truth and falsehood. In such a case, the court held that, section 355 notwithstanding, due process concerns require that the dependency court find that "'the time, content and circumstances of the statement provide sufficient indicia of reliability'" in order for the statement to form the exclusive basis for sustaining jurisdiction over the minor. (*Lucero L.*, *supra*, 22 Cal.4th at p. 1248; see *id.* at pp. 1250–1251 (conc. opn. of Kennard, J.) [out-of-court statements of a child who is subject to a jurisdictional hearing and disqualified as a witness because of the lack of capacity to distinguish between truth and falsehood at the time of testifying may not form the sole basis for a jurisdictional finding unless they show special indicia of reliability].) So long as the minor's hearsay statements are deemed sufficiently reliable, corroboration is not necessary. (*Lucero L., supra*, 22 Cal.4th at pp. 1248-1249; see *In re April C.* (2005) 131 Cal.App.4th 599, 610, fn. 5.)

Although *Lucero L.* is directly controlling here, Daniel fails to cite it in his opening brief, and relies on *Cindy L., supra,* 17 Cal.4th 15, to argue that hearsay statements of a child not available for cross-examination must be supported by "significant corroborating evidence" in order to be admissible. However, in

24

*Lucero L.*, the Supreme Court limited its earlier holding in *Cindy L.*, which had held that the out-of-court statements of a child, including a child's hearsay statements contained in social workers' reports, were admissible in dependency jurisdiction proceedings (1) if the statements show particular indicia of reliability; (2) if, where the child is not available for cross-examination, the statements are corroborated; and (3) if interested parties have notice that the statements will be used. (*Lucero L., supra*, 22 Cal.4th at p. 1231.) The *Lucero L.* court recognized that the Legislature had amended section 355 in 1997 to codify a somewhat broader "child dependency" exception to the hearsay rule than that articulated in *Cindy L.* Whereas *Cindy L.* had required corroboration of a child witness's hearsay statements where the child was not available for cross-examination, *Lucero L.* held that such corroboration is not required in cases involving a "truth incompetent" minor who is the subject of a jurisdictional hearing where the statements are sufficiently reliable. (*Lucero L., supra*, 22 Cal.4th at p. 1242, 1246.)

Thus, under *Lucero L.*, Aileen's hearsay statements are admissible, whether or not corroborating evidence exists, if they are sufficiently reliable, i.e., the time, content, and circumstances of the statements provide sufficient indicia of reliability.

2. *Aileen's Statements Were Sufficiently Reliable to be Admissible Without Corroborating Evidence*

We review for substantial evidence the dependency court's finding that the time, content, and circumstances of Aileen's statements provide sufficient indicia of reliability. (*In re Lucero L., supra,* 22 Cal.4th at pp. 1248-1249 [reviewing for substantial evidence the dependency court's finding that hearsay statements were reliable].) Factors bearing on the inherent reliability of a child witness's

25

statements in sex abuse cases include, but are not limited to "'(1) spontaneity and consistent repetition; (2) the mental state of the declarant; (3) use of terminology unexpected of a child of a similar age; and (4) lack of motive to fabricate. [Citation.]'" (*Id.* at p. 1239.)

According to Grandmother, while she was putting a diaper on Aileen after picking her up from a stay at Virginia's home, Aileen made spontaneous statements about Daniel touching her vaginal area. These statements were made contemporaneously with statements that she was hurting and behavior suggesting that she was in pain. Further, she made the statements soon after being picked up from Virginia's home. She then consistently complained of pain for the next two days.

Similarly, Aileen's statements to Deputy Lopez in the hospital about physical and sexual abuse by Daniel were made spontaneously, in reaction to general questions about whether she was hurt. Deputy Lopez did not ask Aileen who had hurt her or ask if her private parts had been touched. Asked if she felt pain anywhere, Aileen stated, "Daniel punched me," while making a fist and directing it towards her stomach. When Deputy Lopez asked who Daniel was, Aileen looked down and did not want to talk about him. Then, when Deputy Lopez drew the figurine and asked Aileen to show her where she was hurt, Aileen scribbled on the hands, chest, and vaginal areas of the rough figurine Deputy Lopez had drawn, grabbed her chest area and motioning towards her vagina with a grabbing motion, and stated, "I was holding hands with my friend and [Daniel] touched us both and grabbed us right here." The simple, demonstrative manner in which Aileen conveyed this information was age-appropriate and supports the reliability of her statements. Moreover, the dependency court concluded that the

reported statements were consistent with the court's observations of the child's capacity.

The record shows that after providing Deputy Lopez with limited answers to her questions, Aileen "shut down" and refused to answer the deputy's further questions, and looked down every time Daniel's name was mentioned. In subsequent questioning by other deputies, caseworkers and investigators, Aileen consistently was withdrawn, tense, uncooperative, and fearful when asked about possible abuse. Further, her demeanor and conduct consistently demonstrated that she was afraid of Daniel. Her general statements that Daniel was "mean," her refusal to further elaborate, and her general denial in response to a deputy's questions asking whether anyone had ever hit her or touched her vagina, were all made after she had "shut down," and they do not diminish the reliability of her initial, spontaneous statements providing specific information about abuse by Daniel.

Further, there was no indication that Aileen was coached into implicating Daniel. Aileen's use of hand motions to describe the physical abuse and molestation are not indicative of coached accusations. (See *Lucero L., supra*, 22 Cal.4th at p. 1250 ["Lucero's language, while not precocious, was age appropriate and her statements had the mark of being made in her own words, without evidence of prompting."].) Further, no evidence was introduced of any animus towards Daniel on the part of Aileen's paternal relatives. It does not appear that Mario had ever met or seen Daniel, and Grandmother had seen him but had never spoken with him. Neither Grandmother nor Mario mentioned Daniel to Deputy Lopez; instead, Aileen was the first one to mention him. Moreover, although Grandmother stated that Aileen had told her that Daniel had touched her private parts, Grandmother says she told Aileen this was not true, and she did not tell

Mario because she was scared of his reaction. At the hospital, Mario reacted with shock and anger upon hearing Deputy Lopez repeat Aileen's allegations about Daniel. These facts suggest that Aileen was not coached to allege physical and sexual abuse by Daniel and that her statements were true.

In sum, we conclude that Aileen's statements to Grandmother and to Deputy Lopez regarding physical and sexual abuse by Daniel were sufficiently reliable to constitute substantial evidence of such abuse.

### 3. *Aileen's Statements Were Corroborated*

Even if Aileen's statements, standing alone, did not bear sufficient indicia of reliability, they were still properly admitted because there was corroborating evidence of physical and sexual abuse. (*Lucero L., supra*, 22 Cal.4th at pp. 1248-1249.)

"'Corroborating evidence is "[e]vidence supplementary to that already given and tending to strengthen or confirm it. Additional evidence of a different character to the same point." [Citation.] In this context, corroborating evidence is that which supports a logical and reasonable inference that the act described in the hearsay statement occurred. [Citation.]' [Citation.]" (*In re Christian P.* (2012) 208 Cal.App.4th 437, 448.) "[W]ith respect to dependency jurisdictional findings, corroborative evidence, whether direct or circumstantial, (1) is sufficient if it tends to connect the allegedly offending parent with the alleged negligent act even though it is slight and "'entitled, when standing by itself, to but little consideration [citations], nor does it need to establish the precise facts'" in the hearsay statements; (2) is sufficient if it tends to connect the allegedly offending parent with the alleged negligent act and the parent's "'own statements and admissions, made in connection with other testimony, may afford corroboratory proof

28

sufficient'" to find jurisdiction; (3) need not "'go so far as to establish by itself, and without the aid of the testimony of [the hearsay declarant], that the [allegedly offending parent] committed the [negligent act] charged"'; (4) may include the allegedly offending parent's "'"own testimony and inferences therefrom, as well as the inferences from the circumstances surrounding the entire transaction"'"; and (5) may consist of '[f]alse or misleading statements to authorities . . . or as part of circumstances supportive of corroboration.' [Citation.] ""[W]hether the corroborating evidence is as compatible with innocence as it is with guilt is a question of weight for the trier of fact [citations].' [Citation.]" [Citation.]' [Citation.]" (*Ibid.*)

In this case, corroborating evidence supported Aileen's statements regarding physical abuse by Daniel. Grandmother had previously observed bruises on Aileen and her siblings when she returned from a stay at Virginia's house. In addition, through her non-verbal behavior, Aileen consistently demonstrated a fear of Daniel. Moreover, Daniel had a restraining order against him based on the fact that he had kicked Mariah's then four-year-old sibling, Ruben, in the stomach. Further, Daniel had suffered convictions for physical abuse of his romantic partners, including teenage girls.

Substantial evidence corroborating Aileen's statements regarding sexual abuse was also introduced. Grandmother found blood and discharge on Aileen's underwear, and on toilet paper after wiping her, on the day she picked up Aileen from a stay at Virginia's house, where Daniel was present. Grandmother also observed that Aileen did not want to be touched in her private area and appeared to be in pain when Grandmother was putting a diaper on her. Further, Daniel and Virginia admitted that Daniel sometimes brought his four-year-old daughter Mariah with him to stay at Virginia's house while Aileen was there, corroborating

29

Aileen's statements that she was holding hands with her "friend" who stayed at Virginia's house when the abuse occurred. In addition, Grandmother and Mario reported changes in Aileen's behavior, such as becoming more withdrawn and antisocial, having nightmares, and exhibiting some sexualized behaviors. Both Aileen and Mariah reportedly had more toilet accidents after the allegations surfaced. Finally, Daniel's past criminal history involving sexual abuse of teenage girls constitutes additional corroborating evidence. Substantial evidence thus supported the dependency court's findings that Daniel physically and sexually abused Aileen.

"[S]ection 300 does not require that a child actually be abused or neglected before the juvenile court can assume jurisdiction. The subdivisions at issue here require only a 'substantial risk' that the child will be abused or neglected. . . . 'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.' [Citation.]" (*In re I.J., supra,* 56 Cal.4th at p. 773.) Given its findings regarding physical and sexual abuse of Aileen, the dependency court properly exercised jurisdiction under section 300, subdivision (a) (substantial risk of serious non-accidental physical harm) over Heaven and Mariah, and under subdivision (b) (substantial risk of serious physical harm) and subdivision (d) (substantial risk of sexual abuse) over Heaven, Mariah, and Danny.

A. *Risk of Physical Abuse of Heaven, Mariah, and Danny*

Daniel first argues that it was inconsistent for the dependency court to dismiss the allegation under section 300, subdivision (a) that Danny was at risk of physical abuse based on Daniel's physical abuse of Aileen, but to sustain substantially identically counts under subdivision (a) with respect to Heaven and

30

Mariah. Daniel notes that the allegation under subdivision (a) was dismissed with respect to the dependency petition involving Aileen and her siblings. He asserts that in dismissing the allegation in Aileen's case, the court found that Daniel did not inflict serious physical harm on Aileen, and that this finding was binding with respect to the other minors. However, the court made no such finding. Rather, the court explained that it was dismissing the allegation under subdivision (a) as to Aileen and her siblings because abuse by a *parent* is required under that subdivision, and Daniel is not Aileen's parent. That rationale does not apply as to Heaven, Mariah, and Danny. It is likely that the court mistakenly dismissed the allegation under subdivision (a) with respect to Danny, but it was not required to repeat the same mistake as to Mariah and Heaven.

Daniel also challenges the sufficiency of the evidence supporting jurisdiction under section 300, subdivisions (a) with respect to Heaven and Mariah, and under subdivision (b) as to Heaven, Mariah, and Danny, based on the alleged risk of physical abuse. In order for the minors to be declared dependent children within subdivision (a), there must be substantial evidence that they have suffered or there is a "substantial risk" that they will suffer, "serious physical harm" inflicted non-accidentally by Daniel. (§ 300, subd. (a).) Similarly, for purposes of jurisdiction under subdivision (b), DCFS must establish that the children suffered, or there is a substantial risk that they will suffer, "serious physical harm or illness," as a result of neglectful conduct by a parent in one of several specified forms. (§ 300, subd. (b); see *In re James R.* (2009) 176 Cal.App.4th 129, 135.) Evidence of a single incident of serious physical harm to a child may be sufficient for the juvenile court to assume jurisdiction. (See *In re J.K., supra,* 174 Cal.App.4th at p. 1439 [jurisdiction appropriate under subdivision (a) where father broke down door and struck daughter, dislocating her shoulder]; *In re Mariah T.* (2008) 159 Cal.App.4th

31

428, 438 [jurisdiction proper where on one occasion mother used a belt on her three-year-old's stomach and arms, leaving "deep, purple bruises"].)  While we are not aware of any case defining the term "serious physical harm," in this context the word "serious" is defined as "having . . . dangerous possible consequences." (Merriam-Webster's Collegiate Dict. (11th ed. 2006) at p. 1136.)

In this case, there was evidence that Daniel had hit Aileen and her siblings in the past, causing bruises.  In addition, Aileen reported that Daniel had hit her hands, punched her in the stomach, and hurt her by throwing her hard on the bed. Moreover, Daniel had a restraining order against him as a result of kicking Mariah's four-year-old sibling, Ruben, in the stomach, hard enough that he could not breathe.  In addition, Daniel had a long history of engaging in serious domestic violence, including with his minor girlfriends, resulting in two felony convictions. This unrelenting pattern of physical abuse by Daniel of minors, from four years old to teenagers, constituted substantial evidence that Heaven, Mariah, and Danny were at substantial risk of serious physical harm from Daniel.

## B.  *Risk of Sexual Abuse of Heaven, Mariah and Danny*

Daniel challenges the exercise of jurisdiction over his three children under section 300, subdivision (d) based on the court's finding that they were at "substantial risk" of being sexually abused by him.  (§ 300, subd. (d).)  Daniel contends that even assuming that he sexually abused Aileen, the dependency court erred in finding that Heaven, Mariah, and Danny are at substantial risk of sexual abuse.  He relies on the fact that his children are not related to Aileen and none of them live in the same household as him, and he further argues that his alleged touching of Aileen is not the kind of sexually aberrant behavior that reasonably would lead to the conclusion that all his children are at risk.

32

That Aileen is not related to Heaven, Mariah and Danny does not undermine the court's finding, particularly given that Daniel had assumed the role of a pseudo-stepfather to Aileen as a frequent houseguest in Virginia's home who shared a bed with Aileen and Virginia when he was there. (*Los Angeles County Dept. of Children & Family Services v. Superior Court* (2013) 215 Cal.App.4th 962, 970 [rejecting the juvenile court's distinction between a stepdaughter and a biological daughter when considering whether sexual abuse of one child in the household puts at risk other children in the household, and noting that focus should be on whether adult has assumed a parenting role towards the child]; *In re Ricky T.* (2013) 214 Cal.App.4th 515, 523 [dismissing argument that jurisdiction could not be asserted where the sex abuse victims were not siblings of child over whom dependency was sought, because all three children saw the abuser as their grandfather].) Further, despite Daniel's claim that he did not live in the same household as any of his children, the evidence showed that Daniel spent significant unmonitored time with both Mariah and Danny, including overnight visits. According to Mariah, when Daniel stayed in Tina's home, he slept in a bed with Danny, Mariah, and Tina, and when he stayed in Virginia's home he slept in a bed with Aileen, Mariah, and Virginia. Thus, he had access to Mariah and Danny. And although he did not stay in a household with Heaven, he did have unmonitored visits with her.

Moreover, Aileen stated that there was another little girl staying at Virginia's house who was touched by Daniel, and it was established that Mariah stayed at Virginia's house with Daniel. Therefore, it is likely that the other girl being touched by Daniel was Mariah. Further, the fact that Mariah is the same age as Aileen puts her at heightened risk of sexual abuse by Daniel. As for 14-year-old Heaven, Daniel had a history of sexually assaulting, and even forcibly raping,

33

teenage girls not much older than she.  In sum, Daniel's sexual abuse of Aileen, coupled with his extensive history of sexual crimes beginning at age 12 or 13, constitute substantial evidence that his three minor children were at risk of sexual abuse.

Daniel makes the additional argument that the allegations that he sexually abused Aileen, a girl, do not support the dependency court's finding that his son, Danny, was at risk of sexual abuse.

In the recent decision *In re I.J., supra*, 56 Cal.4th 766, our Supreme Court addressed the issue of "whether a father's sexual abuse of his *daughter* supports a determination that his *sons* are juvenile court dependents when there is no evidence the father sexually abused or otherwise mistreated the boys, and they were unaware of their sister's abuse." (*In re I.J., supra,* 56 Cal.4th at p. 770.)  In that case, the daughter was 14, and she had three younger brothers, 12–year-old twins and an eight year old. (*Id.* at p. 771.)  The Supreme Court found that jurisdiction over the three boys was appropriate given that father's behavior was "aberrant in the extreme," in that he forcefully raped his daughter by placing his penis in the child's vagina and repeatedly abused her over a three-year period.  (*Id.* at pp. 770, 778.)  The court held as follows:  "For present purposes, we may assume that father's other daughter is at greater risk of sexual abuse than are his sons.  But this does not mean the risk to the sons is nonexistent or so insubstantial that the juvenile court may not take steps to protect the sons from that risk.  'Although the danger of sexual abuse of a female sibling in such a situation may be greater than the danger of sexual abuse of a male sibling, the danger of sexual abuse to the male sibling is nonetheless still substantial.'  [Citation.]" (*In re I.J., supra*, 56 Cal.4th at pp. 779-780.)

34

The Supreme Court concluded as follows: "All we are holding at this point is that when a father severely sexually abuses his own child, the court may assume jurisdiction over, and take steps to protect, the child's siblings [including siblings of a different sex]. [¶] . . . . In upholding the assertion of jurisdiction in this case, we are not holding that the juvenile court is compelled, as a matter of law, to assume jurisdiction over all the children whenever one child is sexually abused. We merely hold the evidence in this case supports the juvenile court's assertion of jurisdiction." (*In re I.J., supra*, 56 Cal.4th at p. 780.)

*In re I.J.* is not directly on point, in that the instant case does not involve severe or prolonged sexual abuse of a sibling. Most significant for the instant case is *I.J.*'s rejection of *In re Alexis S.* (2012) 205 Cal.App.4th 48, *In re Maria R.* (2010) 185 Cal.App.4th 48, and *In re Rubisela E.* (2000) 85 Cal.App.4th 177, to the extent these decisions held that sexual abuse of a female child may not, standing alone, support the jurisdictional finding that a male child was at risk of sexual abuse. (*In re I.J., supra*, 56 Cal.4th at pp. 780-781.)

*In re P.A.* (2006) 144 Cal.App.4th 1339, more closely resembles our case with respect to the severity of the alleged abuse. In that case, the dependency court concluded that there was substantial evidence that on two occasions the father had sexually abused his nine-year-old daughter by touching her vagina under her clothes and on top of her underwear, and further concluded that her two younger brothers, ages eight and five, were at risk of sexual abuse. Despite the less shocking abuse in that case, the court concluded that "where, as here, a child has been sexually abused, any younger sibling who is approaching the age at which the child was abused, may be found to be at risk of sexual abuse. . . . [A]berrant sexual behavior by a parent places the victim's siblings who remain in the home at risk of aberrant sexual behavior." (*In re P.A., supra,* 144 Cal.App.4th at p. 1347.)

35

Notably, in *I.J.*, the court discussed *In re P.A.* and left its holding intact. (*In re I.J., supra*, 56 Cal.4th at pp. 775-776.)

In the instant case, the dependency court found that the fact that Danny was a boy was not determinative, because Aileen was only four years old and obviously pre-pubescent at the time of the abuse. Thus, the court found that the closeness of Aileen's and Danny's ages more compelling than their sexes. Moreover, evidence was also presented that Danny had a history of sexually abusing teenage girls, beginning when he was a young teenager himself, and that he himself had been the victim of sexual abuse as a child. The record shows that Daniel has engaged in long-term aberrant sexual behaviors. Thus, dependency jurisdiction was properly exercised over Danny based on a risk of sexual abuse.

**DISPOSITION**

The orders sustaining jurisdiction are affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


WILLHITE, J.


We concur:


EPSTEIN, P. J.


MANELLA, J.

37